**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JEWELTEX MANUFACTURING INC., RETIREMENT PLAN, Individually and On Behalf of All Others Similarly Situated, | ) ) ) ) **CASE NO.** |
| Plaintiff, | ) ) **CLASS ACTION COMPLAINT** ) |
| vs. | ) ) **JURY TRIAL DEMANDED** |
| THE BOEING COMPANY, DENNIS A. MUILENBURG, ROBERT A. BRADWAY, DAVID L. CALHOUN, ARTHUR D. COLLINS, JR., KENNETH M. DUBERSTEIN, ADMIRAL EDMUND P. GIAMBASTIANI, JR., LYNN J. GOOD, NIKKI R. HALEY, LAWRENCE W. KELLNER, CAROLINE B. KENNEDY, EDWARD M. LIDDY, SUSAN C. SCHWAB, RONALD A. WILLIAMS, and MIKE S. ZAFIROVSKI, | ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

Plaintiff Jeweltex Manufacturing Inc., Retirement Plan ("Plaintiff"), by and through its undersigned attorneys, alleges the following based upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, the investigation conducted by his counsel which included, among other things: (a) a review and analysis of regulatory filings of The Boeing Company ("Boeing" or the "Company") filed with the United States Securities and Exchange Commission ("SEC"); (b) a review and analysis of press releases and media reports issued and disseminated by Boeing; (c) a review of other publicly available information concerning Boeing, including articles in the news media and analyst reports; (d) a review and analysis of regulatory investigations and reports; and (e) complaints and related materials in litigation commenced against some or all of the Defendants

pertaining to Boeing and the fatal accidents involving the 737 Max series of aircraft (the "737 Max Accidents") and their causes and aftermath.

## INTRODUCTION

1.      This action is brought as a class action on behalf of all holders of Boeing stock at the close of business on February 28, 2019 that are eligible to vote for, among other things, the annual election of directors scheduled to take place on Monday, April 29, 2019 (the "Annual Meeting"), to address the proxy and other securities law violations by the Company, its Board of Directors, and its executive officers, which, as a result of the conduct complained of herein, disseminated a materially false and misleading Proxy Statement filed with the SEC on March 15, 2019 (the "Proxy Statement").

2.      On October 29, 2018, the first airline crash involving the Boeing 737 MAX 8 occurred when Lion Air Flight 610 ("Flight 610") crashed into the Java Sea eleven minutes after takeoff, killing all 189 people on board (the "First Crash"). Less than five (5) months later on March 10, 2019, Ethiopian Airlines Flight ET302 ("Flight ET302"), also a Boeing 737 MAX 8, crashed minutes after takeoff killing all 157 people on board (the "Second Crash"). It was reported over the next few days that there were similarities in the two crashes and that the common factor in both crashes was the Maneuvering Characteristics Augmentation System (the "MCAS"). In those next few days following the crash and prior to March 15, 2019, numerous countries around the world, including the United States, grounded the Boeing 737 MAX. As of the filing of this complaint, every single Boeing 737 MAX has been grounded and Boeing has announced that it is going to cut production of its 737 MAX by over 20%, rather than increase it by at least 10% as originally planned. Analysts are opining that a return to flight and resumption of deliveries is expected to be months rather than only weeks away.

2

3.      On March 15, 2019, five (5) days after the Second Crash on March 10, 2019, and after being grounded by numerous countries, Boeing filed its 2019 proxy statement (the "Proxy Statement"). The Proxy Statement seeks: (i) the election of all 13 director nominees constituting the entire Boeing board of directors (the "Board"); (ii) approval, on an advisory basis, of named executive officer compensation; (iii) ratification of the appointment of the Company's independent auditor; and (iv) certain shareholder proposals that the Board has recommended shareholders vote against, including the appointment of an independent Chairman. The Second Crash, the grounding of its 737 MAX fleet and any other material information regarding the 737 MAX and any mention of the two crashes are nowhere to be found in the Proxy Statement. The only mention of the First Crash is in a shareholder proposal in the text provided by the shareholder. After March 15, 2019, the fallout continued. Yet Defendants failed to update the Proxy Statement as required.

4.      Boeing's Proxy Statement is materially false and misleading because it fails to disclose the recent crippling events and circumstances that have shaken the Company to its core, subjected the Company to virtually unlimited civil and criminal prosecution and investigation, grounded its most innovative and profitable fleet of 737 MAX jets, and, among other things, left the Company scrambling to fix its most advanced automated flight systems and controls that both paralyzed its fleet and unveiled an air of secrecy and disinformation surrounding the introduction of this fleet without the necessary warnings to and training of pilots before introduction of the new automated systems incorporated into the design and engineering of this fleet and the method for stabilizing a plane experiencing a malfunction of these automated systems.

5.      Boeing's very existence as the most profitable, innovative, and advanced aerospace company in the world has fallen out of the sky after the sudden crash – under eerily similar circumstances – of two of its newest and most advanced aircraft. In an astonishing series of events,

which are still in the process of being investigated by a myriad of regulatory and governmental bodies, two practically new Boeing 737 MAX aircraft came crashing down to earth with a full payload of passengers and crew within only a few short minutes after takeoff, leaving no survivors. In both cases, the planes presented the pilots with hazardous readings and maneuvers almost immediately after take-off. In both cases, the pilots valiantly – but unsuccessfully – wrestled with their manual flight controls to keep the planes flying safely. In both cases, the automated flight systems essentially took control of the aircraft away from the pilots and would not allow the pilots to override these systems and wrest back control of the aircraft. In both cases, the very innovations that were supposed to propel Boeing and its aircraft to the next level of flight advancement and safety actually doomed its planes and materially sullied the Company's reputation, business and prospects, leaving in their wake a Company surrounded by criminal and civil investigations, the grounding of the most advanced aircraft ever made, and myriad of lawsuits that have also followed.

6.  What has quickly been pieced together in the aftermath of these flight disasters is that:

- Defective and unreliable "angle of attack" sensors played a significant role in the tragic ending of the 737 Max accidents;

- MCAS was defective and unreliable and played a significant role in the 737 Max accidents;

- MCAS was defective and unreliable because, among other things, it was activated by data from only one sensor, even if another sensor indicated the plane was not close to stalling;

- MCAS was defective and unreliable because, among other things, if it was engaged at takeoff, pilots had less than 40 seconds to override MCAS's forced push downs of the plane nose, leaving too little a margin for error;

- MCAS's role in flight was never fully disclosed to pilots and never properly developed to begin with;

4

- MCAS could push 737 MAX aircraft down even when its nose is not up and despite pilot efforts to pull the plane up, a confounding event to a pilot even if familiar therewith;

- According to the latest reports, the defective sensors and the MCAS system itself combined to fool the automated flight systems in the 737 MAX accidents to "think" that the planes' noses were too high, resulting in the system pushing down the noses, causing a frantic battle between man and machine for most of the time these planes were in the air, superseding even the manual commands of pilots attempting to correct the mis-positioning of the aircraft;

- Boeing knew about the defects and unreliability of its angle of attack sensors and MCAS, but failed to notify regulators and pilots thereof;

- Boeing put money ahead of safety by charging airlines $80,000 to install a warning light in the cockpit to alert pilots if erroneous signals were sent from the angle of attack sensors to MCAS;

- Boeing recklessly rushed introduction of the 737 MAX to avoid losing market share to chief rival Airbus SE;

- Boeing's Board had not approved the 737 MAX design before it was offered to American Airlines, its first customer, to prevent that airline from buying planes from Airbus;

- Boeing artificially minimized 737 MAX design changes so that extra pilot training would not be required by the FAA and retraining costs for airlines would be obviated;

- Boeing's reputation for safety and its tradition of prioritizing pilot authority over automation has been seriously tarnished by the foregoing;

- Regulators globally have grounded all 737 MAX flights;

- Boeing's stock price has suffered an enduring slide, losing about $30 billion in market value;

- Federal prosecutors have opened an investigation into the development of the Boeing 737 Max as a potential criminal case;

- Congress has opened inquiries into the development of the Boeing 737 Max and its approval by the FAA, publicly encouraging whistleblowers to come forward;

- European regulators have opened inquiries into the safety of the 737 Max;

- Boeing has formed a Special Committee of its Board to review company-wide policies and processes for the design and development of Boeing aircraft;

- Boeing has cut production of its 737 MAX by over 20% instead of increasing production by 10%, as originally planned;

- Boeing is shifting resources away from production to develop the new software, etc. to address the MCAS issue;

- Garuda Indonesia Airline publicly canceled an order for the 737 MAX in the amount of $4.9 billion representing over 50 planes;

- Boeing faces a huge bill to reimburse airlines for the grounded planes, which has been estimated to already be approximately $2 billion, which amount increases on a daily basis;

- Analysts have opined that a return to flight and resumption of deliveries for the 737 MAX is expected to be months rather than weeks away; and

- Boeing is a named defendant in several wrongful death suits arising from the 737 Max accidents.

7.    Plaintiff is challenging the failure to disclose these material events in three ways.

First, the failure to make these material disclosures calls into question the ability and fitness of these directors to hold office, especially their judgment and credibility. All 13 directorships are up for election. Second, there is a say on pay vote for the executive officers responsible for this debacle and poor handling of its aftermath. Although advisory in nature, the Board (and its Compensation Committee) consider the say on pay results as factors worthy of consideration when determining executive compensation. In fact, the Proxy Statement states:

> In 2018, our executive compensation program received 93% approval from our shareholders. The favorable shareholder vote and positive feedback from investors were two factors that contributed to the Compensation Committee's decision to make no substantial changes to our compensation practices and policies in 2018. The Compensation Committee will continue to consider say-on-pay vote results and feedback from shareholders when reviewing our executive compensation program and practices.

8.      These events which have caused the Company to lose billions in market value call into question these executives' ability to run this Company and their credibility in being transparent and making full and fair disclosures regarding these tragic events and their aftermath. The failure to disclose these events in the Proxy Statement is a material omission altering the total mix of information available to Boeing shareholders in determining whether or not to approve the executive compensation.

9.      Lastly, there is a shareholder proposal for an independent Chairman of the Board, which the Board recommends shareholders not approve, touting the performance of its present Chairman. Presently, the position of Chairman of the Board is filled by the Company's CEO and President, defendant Dennis A. Muilenburg. Again, Muilenburg's handling of the two crashes and failure to make full and fair disclosure is material information that alters the total mix of information which is necessary for an eligible shareholder to render an informed vote.

10.     Plaintiff and the Class require immediate relief and seek an order enjoining the Annual Meeting from going forward indefinitely until Defendants make full and fair disclosure regarding the two crashes and their aftermath in order that Boeing shareholders eligible to vote have sufficient information to make an informed decision.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction of this matter pursuant to Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78aa, and 28 U.S.C. § 1331, in that defendants committed unlawful acts in violation of the Exchange Act and the rules and regulations of the SEC promulgated thereunder, and have done so by the use of the means of interstate commerce and the mails.

12.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C.A. § 78aa, and 28 U.S.C.A. §§ 1391(b) and (c).  Acts and transactions constituting the violations complained of have taken place in this District and the Plaintiff is present in this District.

## PARTIES

13.    Plaintiff at all times relevant to the allegations herein, was the owner of shares of Boeing common stock.  Plaintiff resides in this District and received the Proxy Statement in this District.

14.    Defendant Boeing is a corporation duly organized and existing under the laws of the State of Delaware.  Its principal executive offices are located at 100 North Riverside Plaza, Chicago, Illinois. Its stock is traded on the New York Stock Exchange.

15.    Defendant Dennis A. Muilenburg is Boeing's Chairman of the Board of Directors, President and Chief Executive Officer.  He has been nominated for re-election in the Proxy Statement and, as the sole executive director of the Company, approval of his compensation, including his base salary, an annual incentive compensation of 175% (100% performance based) and long-term incentive compensation of 750% (75% performance based) over base salary, respectively, has also been sought on an advisory basis.

16.    Defendant Robert A. Bradway ("Bradway") is a Boeing director since October 2016 and a member of its Audit and Finance Committees.  He has been nominated for re-election in the Proxy Statement.  In 2018, Bradway received total compensation of $346,000.

17.    Defendant David L. Calhoun ("Calhoun") is a Boeing director since June 2009 and Lead Director since April 2018.  He is Chair of its Governance, Organization and Nominating Committee and a member of its Compensation Committee.  He has been nominated for re-election in the Proxy Statement.  In 2018, Calhoun received total compensation of $355,110.

18.     Defendant Arthur D. Collins, Jr., ("Collins") is a Boeing director since February 2007, Chair of its Compensation Committee and a member of its Governance, Organization and Nominating Committee.  He has been nominated for re-election in the Proxy Statement.  In 2018, Collins received total compensation of $366,000.

19.     Defendant Kenneth M. Duberstein ("Duberstein") is a Boeing director, serving as Lead Director from January 1, 2018 through April 29, 2018, and a member of its Compensation Committee.  In 2018, Duberstein received total compensation of $355,890.

20.     Defendant Admiral Edmund P. Giambastiani, Jr. ("Giambastiani"), is a Boeing director since 2009 and a member of its Audit, Finance, and Special Programs Committees.  He has been nominated for re-election in the Proxy Statement.  In 2018, Giambastiani received total compensation of $325,630.

21.     Defendant Lynn J. Good ("Good") is a Boeing director since 2015 and a member of its Audit and Finance Committees.  She has been nominated for re-election in the Proxy Statement.   In 2018, Good received total compensation of $315,000.

22.     Defendant Nikki R. Haley ("Haley") has been nominated as a first-time director of the Company.  She is former U.S. Permanent Representative to the United Nations.

23.     Defendant Lawrence W. Kellner ("Kellner") is a Boeing director since 2011, a member of its Finance Committee, and Chairman of its Audit Committee.  He has been nominated for re-election in the Proxy Statement.  In 2018, Kellner received total compensation of $371,000.

24.     Defendant Caroline B. Kennedy ("Kennedy") is a Boeing director since 2017 and a member of its Audit and Finance Committees.  She has been nominated for re-election in the Proxy Statement.  In 2018, Kennedy received total compensation of $343,000.

25.     Defendant Edward M. Liddy ("Liddy") is a Boeing director since 2010 and a member of its Compensation and Governance, Organization and Nominating Committees.  He has been nominated for re-election in the Proxy Statement. In 2018, Liddy received total compensation of $315,000.

26.     Defendant Susan C. Schwab ("Schwab") is a Boeing director since 2010 and a member of its Audit and Finance Committees.  She has been nominated for re-election in the Proxy Statement.  In 2018, Schwab received total compensation of $346,000.

27.     Defendant Ronald A. Williams ("Williams") is a Boeing director since 2010 and a member of its Audit, Finance and Special Programs Committees.  He has been nominated for re-election in the Proxy Statement.   In 2018, Williams received total compensation of $361,000.

28.     Defendant Mike S. Zafirovski ("Zafirovski") is a Boeing director since 2004 and a member of its Compensation and Governance, Organization and Nominating Committees.  He has been nominated for re-election in the Proxy Statement.   In 2018, Zafirovski received total compensation of $346,000.

## CLASS ACTION ALLEGATIONS

29.     Plaintiff brings this action on his own behalf and as a class action, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of all persons holding Boeing common stock at the close of business on February 28, 2019 (except the officers and directors of Boeing, members of their immediate families, and any person, firm, trust, corporation or other entity related to or affiliated with them) (the "Class") eligible to vote in the annual election of directors scheduled to take place on Monday, April 29, 2019.

30.     The Class is so numerous that joinder of all members is impracticable.   There are thousands of Class members who are located throughout the United States, given that there were

564,481,962 shares of Boeing common stock outstanding and over 1.8 million holders of Boeing common stock as of February 28, 2019.  The number and identity of the members of the Class can be ascertained from the books and records of the Company and/or its agents.

31.     There are questions of law and fact which are common to the Class and which predominate over questions affecting only individual class members.  The common questions include, *inter alia*, the following:

a.      whether Boeing participated in and/or pursued a course of conduct, as described herein by making solicitations through a Proxy Statement containing statements that, at the time and the circumstances under which they were made, omitted to state material facts necessary in order to make the statements therein not false or misleading;

b.      whether Boeing's acts, as alleged herein, violated the federal securities laws, specifically Section 14(a) of the Securities Exchange Act of 1934 and Rule 14a-9 promulgated thereunder;

c.      whether Boeing disseminated a Proxy Statement which was materially false and misleading and omitted to disclose material facts relating to the elections submitted to the shareholders for their approval; and

d.      whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

32.     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  The claims of Plaintiff are typical of the claims of the other members of the Class and Plaintiff has the same interest as the other members of the Class. Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

11

33.     The likelihood that individual members of the Class will prosecute separate individual actions to vindicate the claims made herein is remote, due to the burden and expense of prosecuting litigation of this nature and magnitude.  In addition, the prosecution of the claims in separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for defendant.  Furthermore, the prosecution of this action as a class action would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudication.  Plaintiff anticipates that there will not be any difficulty in the management of this litigation.

34.     Boeing has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief on behalf of the Class as a whole is appropriate.

35.     For the reasons stated herein, a class action is superior to other available methods for the fair and efficient adjudication of the controversy and the requirements are satisfied.

## SUBSTANTIVE ALLEGATIONS

36.     The dysfunction of and disinformation pertaining to MCAS and the special sensors placed in the wings and/or nose of Boeing's 737 Max planes to warn of an impending stall are core matters at the center of this case and are subject to intense scrutiny by regulators, prosecutors and others because of their believed involvement in the 737 Max accidents.

37.     By way of background, the introduction of newer more efficient jet engines for the Company's stalwart 737 aircraft (a narrow bodied, twin engine passenger airliner with a short to medium range continuously manufactured since 1967, with more than 10,000 such aircraft delivered) required reengineering of the engine's placement relative to the placement of its older,

less efficient engines.  The newer engines needed to be mounted higher and more forward than did the original engines, materially changing plane balance and flight characteristics.

38.     In order to compensate for the altered flight characteristics, which make planes more nose heavy, automated flight control systems were modified to keep the nose up and maintain proper aerodynamics, known as the "angle of attack" ("AOA").  Technically, the angle of attack is the angle of the wing relative to the plane's direction of travel or vector. When a plane is flying straight and level the angle of attack might be zero or close thereto.  Conversely, when the plane ascends, the angle of attack is higher.  However, if the angle of attack is too high relative to the speed of the plane, a disruption of the airflow over the wing can occur, which will be followed by a complete loss of lift, resulting in an engine stall.  When a stall occurs, the plane starts falling from the sky.  To prevent such a stall, the nose of the aircraft is lowered in order to reduce the angle of attack and re-establish consistent airflow over the wing.  As part of the anti-stall system, special sensors are placed in the wings and/or the nose of the plane to warn of an impending stall, which when triggered, causes the plane computer control systems to automatically lower the nose to prevent a stall.

39.     Not surprisingly, a plane's angle of attack is most often at its highest and most pronounced during takeoff.  That is also the time at which the anti-stall system of the 737 Max or MCAS is most likely to engage.  Because of the cross-currents presented by the dueling needs of increased lift to make a plane airborne and lowering a plane's nose in order to prevent engine stall, takeoffs present the most precarious time during which these dueling concerns actually play out. In order to manage this conflict, Boeing created a warning light system to alert pilots to the problem and to give pilots the ability to override MCAS when warranted by disabling the system and manually controlling ascent.  However, this elementary warning light system was not standard

13

equipment. It was an $80,000 optional add-on, until it became standard equipment after the 737 Max accidents.

40.     A very significant change resulting from the adoption of MCAS in the Company's 737 MAX series is how to recover from a false positive engagement of the system.  Unlike the previous model 737, in which pulling back on the yoke would always raise the plane's nose, doing so would not work on the 737 MAX because MCAS overrides all manual instructions.  The only way initially thought viable to recover from such a situation on the 737 MAX is to disable MCAS. Later, however, even disabling the MCAS has come under scrutiny.

41.     The First Crash involving the 737 MAX series occurred on October 29, 2018, when Flight 610, a practically new Boeing 737 MAX 8, crashed into the Java Sea eleven minutes after takeoff, killing all 189 people on board.

42.     In an Aircraft Accident Investigation Report, dated October 29, 2018 (the "Indonesian Investigation Report"), it is reported that maintenance logs of Flight 610 reported problems with airspeed and altitude readings on four of the six flights operating during the three days prior to the crash.  In fact, the problems were serious enough that on the plane's second-to-last flight, the crew reported a "stick shaker activation," which warns of a stall and "is considered as an un-airworthy condition and the flight shall not be continued," which itself came one day after one angle-of-attack sensor was replaced on the same jet after the crew reported similar serious safety issues.

43.     On November 6, 2018, the Company publicly announced – for the first time – that the type of "angle of attack" sensors used in this aircraft can, in some circumstances, provide erroneous information to the pilot, such as the angle of the aircraft's nose.  According to Dennis Tajer, a veteran American Airlines captain and spokesperson for the Allied Pilots Association

14

("APA") union who has flown 737 MAX 8 planes, he only learned about MCAS through the Boeing bulletin issued on November 6, 2018. As Tajer stated: "Automation is an outstanding addition to the aircraft when it's in collaboration. But when you don't tell the human about it, it disconnects the human being from the system." Tajer's sentiments were echoed by other American and Southwest pilots. Contrary to Defendant Muilenburg statements at this time that the 737 Max is "safe…This airplane went through thousands of hours of tests and evaluations, certification, working with the pilots, and we've been very transparent on providing information and being fully cooperative on the investigative activity," the bulletin itself states: "This is the first description you, as 737 pilots, have seen."

44.     On November 9, 2018, Boeing amended the 737 MAX manuals to include instructions on how to disconnect stabilizer trim switches in the cockpit, which is intended to override faulty sensors that can prematurely activate MCAS.

45.     On November 13, 2018, *The Wall Street Journal* reported that these AOA sensors may have played a significant role in the tragic crash of Flight 610. According to the article, U.S. and Indonesian investigators believe that the AOA sensors on Flight 610 sent incorrect data to flight-control computers and are believed to be at least one of the causes of the accident. Both governments are now investigating the dire consequences posed by defective or unreliable AOA sensors.

46.     According to the foregoing article in *The Wall Street Journal*, another possible cause of the Flight 610 accident is Boeing's MCAS in the 737 MAX 8 and MAX 9 models, which systems were implemented without ever highlighting this new flight-control feature in training manuals and without training pilots in its use prior to implementation. To pilots, the controls for the new aircraft looked the same as earlier models thereof, but the new stall-prevention system

was very different than the automated systems previously employed.  Not only was this feature not disclosed to pilots, which in itself constitutes an unacceptable risk, but dangerous automated nose-down commands, designed to cause the aircraft to dive if the nose was raised too high, were also hidden from them.

47.    While pilots are familiar with various automatic safety features that can kick in during emergencies, they were not trained regarding, or even made aware, of MCAS.  According to Mike Michaels, Chairman of the APA, Boeing's warnings regarding the AOA sensors came far too late for pilots who were never told about the new dive-prevention system in the first place.

48.    Indeed, the impaired functionality of the AOA sensors on the Boeing 737 MAX 8 was made clear to Boeing at least three weeks before the crash of Flight 610, when Southwest Airlines ("Southwest") replaced two malfunctioning AOA sensors, the same type used on Flight 610.  According to other reports, the Company knew that its new flight-control feature not only suffered from defective AOA sensors, but also knew that the system could cause the aircraft to dive or crash precipitously, superseding even the manual commands of pilots attempting to correct the mis-positioning of the aircraft.

49.    On November 26, 2018, Defendant Muilenburg wrote Boeing employees stating that the Company did not intentionally withhold information about the 737 MAX from customers and that "The relevant [MCAS] function is described in the [flight crew operations manual, or FCOM], and we routinely engage customers about how to operate our airplanes safely."  However, this was not true.  As reported by the Dallas News on March 12, 2019, U.S. pilots had complained in November 2018 about the 737 MAX MCAS.

50.    On November 27, 2018, the *New York Post* reported that the MCAS was not fully explained to pilots.  Furthermore, the article reported that a flaw in MCAS could push 737 MAX

16

aircraft down even when its nose is not up and despite pilot efforts to pull the plane up, both of which were also hidden from pilots. Thus, pilots did not know what to do in either situation.

51.     The *New York Post* reported that MCAS forced Flight 610 down due to bad information from sensors. From the time of takeoff at 6:20 a.m. local time, the pilots battled the automatic nosedive control as the plane went up and down before crashing into the Java Sea at over 400 miles an hour. Notwithstanding the Company's post-crash statements that "appropriate flight crew response" to such a situation, regardless of cause, was already in "existing procedures," the article points out that while older aircraft could safely be pulled back up (by pulling on the yoke in front of them) after an improper nose down situation, pilots reported that this solution did not work on 737 MAX planes. According to the flight data recorder, the pilots on the doomed 610 pulled back on their control columns "to no avail."

52.     According to a November 27, 2018 report by *The New York Times*, the fight between Flight 610's pilots and the MCAS during the plane's 11 minutes of flight were further confirmed by black box information showing a constant up and down of the aircraft's nose during this harrowing time. This was like a deadly game of tag in which the plane pointed down, the pilots countered by manually aiming the nose higher, only for the sequence to repeat about five seconds later. This information, along with graphs, was published by aviation expert and former Boeing avionics engineer Peter Lemme on his website, Satcom Guru.

53.     Furthermore, according to the foregoing report by *The New York Times*, Flight 610's accident report states that "errant data [was received] from one of the two angle-of-attack sensors on the nose of the plane that records the pitch at which a plane is climbing or descending." In fact, "incorrect data readings" on this plane were presented since at least October 26, 2018, according to Indonesian officials. Before Flight 610 departed, one of the two AOA sensors was

replaced by a "serviceable" part which was approved by the Federal Aviation Administration (the "FAA").

54.     On November 28, 2018, *NBC News* reported that from the time Flight 610 was cleared for takeoff until it crashed 11 minutes later, "the flight…experienced stick shaker activation," rendering the plane unfit to fly.  In fact, the stick shaker, intended to warn pilots of a stall, was reading off the same erroneous AOA sensor.  According to this report, notwithstanding Boeing's assertions that pilots were trained how to override the anti-stall function, this information was not to be found in the 737 MAX manual.

55.     Similarly, *CBS News* reported that "The pilots made attempts to regain control of the aircraft, but investigators said they did not hit two cutoff switches that would have deactivated the automated system — as was done by pilots on the plane's previous flight."

56.     In late November, a wave of tort lawsuits on behalf of Flight 610 victims began to be filed against Boeing in Cook County, Illinois.  According to Thomas Demetrio, an attorney representing at least one such victim, "Not only did Boeing place sensors that provided inaccurate data, it also failed to provide the plane's pilots adequate instructions.  It was like Boeing first blindfolded and then tied the hands of the pilots," he said.  In March 2019, Boeing transferred these lawsuits from Cook County to the Northern District of Illinois.

57.     In late November 2018, when Indonesian investigators released their preliminary report on Flight 610, the report found that 610 was not "airworthy" when it took off on October 29, 2018.  The principal reasons given were: (i) a key sensor was replaced; and (ii) a "stick shaker" was vibrating the captain's controls.  According to the report, because the AOA sensor "thought" that the plane's nose was too high, it pushed it down, causing a frantic battle between man and machine for the approximately 13 minutes Flight 610 was in the air.

58.     Boeing reportedly reacted to the report by placing the blame for the Flight 610 crash on Lion Air, pointing to the fact that the same plane landed safely the previous day after similar erroneous data was fed to the pilots.  However, Boeing's defense ignores what was later revealed, that an off-duty pilot who was flying with the previous day's pilots (with only crew members on board) saved the plane from disaster when he cut the power to the motor that was causing the dive.

59.     Boeing's response reportedly lead Lion Air's founder, Rusdi Kirana, to consider cancelling Boeing jet orders.  This is very significant.  As of December 2018, Lion Air's standing orders with Boeing totaled 237 planes or about 5% of the Boeing 737 backlog.  If the orders are cancelled, Boeing stands to lose as much as $23 billion.

60.     On December 5, 2018, *The Wall Street Journal* openly questioned why Boeing omitted details about MCAS in the 737 MAX manual.  According to the article, the "decision to omit the control system from manuals has put a design principle at the center of a probe into a fatal airliner crash for the first time in more than two decades. It has sparked public scrutiny of a typically behind the-scenes process and threatens to tarnish Boeing's reputation for safety and its tradition of prioritizing pilot authority over automation."

61.     On December 26, 2018, *The New York Times* published a detailed article describing how everything went wrong in the short duration of Flight 610.  Two minutes and 55 seconds into the flight, the plane dropped "over 700 feet, furthering the confusion inside the cockpit."  Dennis Tajer called this dip "beyond abnormal" and "unacceptable."  The pilots' response was to move the stabilizers in the opposite direction in an effort to lift the plane's nose back up.  When the plane was at 5,275 feet at six minutes and seven seconds into the flight, the pilots held down the electric stabilizer trim switch repeatedly in a further effort to bring the plane's nose back up.  However, this fix was only temporary as the automatic system kicked back in after 10 seconds.  The pilots

never disabled MCAS.  As Tajer put it: "[I]t's easy to say, 'Well, just look down your trim is running away and take care of it.' That's easy to say from a desk or cubicle. Get in the cockpit, get a thousand feet above the ocean and have all those alerts going on."

62.    On January 14, 2019, divers found the Flight 610 flight recorder.

63.    On March 10, 2019, Flight ET302, also a practically new Boeing 737 MAX 8, crashed minutes after takeoff killing all 157 people on board.  Boeing issued a statement saying it was "saddened" by this crash.

64.    On March 11, 2019, CNN reported the possibility that the pilots struggled with the plane, as was the case in the First Crash.  On the same day, the Economist wrote that "the similarities to the loss of Lion Air Flight 610 in the Java Sea last October are alarming."  Alan Levin of Bloomberg stated: "The stakes for Boeing and one of its most popular models are enormous."  According to Neil Hansford, chairman of the Australian consultant Strategic Aviation Solutions.  "Boeing has lost control of the timetable to provide the safe, reliable solution."

65.    After the Second Crash, China ordered that all domestic 737 MAX 8's be taken out of service and other countries throughout the world began to announce that they would close their respective airspaces to 737 MAX aircraft.

66.    On this same day, the first day of trading since the Second Crash the day before, Boeing's stock dropped around 5%, wiping out almost $13 billion of the Company's market value. The slide in the Company's stock price has been enduring.  From March 11 through March 26, 2019, the Company has lost almost $30 billion in market value.

67.    Also on March 11, 2019, Boeing announced for the first time that software updates were in the works for MCAS.  Furthermore, the Daily Beast's Clive Irving ("Irving") reported that no model of jet aside from the Boeing 737 MAX has recorded twin disasters so soon after

introduction, within six months of each other. Irving questioned whether or not there was a common cause between the two crashes: "The most pressing question for investigators is whether the Ethiopian pilots confronted the same sudden emergency that doomed the Lion Air flight…The last time a new jet was grounded was in 2013, when the Boeing 787 Dreamliner was grounded for three months following a series of fires originating in lithium-ion battery packs that supplied power to the airplane's systems."

68. On March 12, 2019, it was widely reported that the FAA said it expected Boeing to soon complete improvements to MCAS and to update training requirements and related flight crew manuals.

69. On March 13, 2019, the FAA temporarily grounded all Boeing 737 MAX aircraft. On the same day, *CNN* reported that pilots had complained about the 737 MAX in a federal database. After the FAA order, Senator Richard Blumenthal spoke to NPR's All Things Considered to criticize the FAA and Boeing: "This responsibility, it belongs to the FAA to put safety ahead of airline profits…This kind of disregard of responsibility undermines people's trust in institutions as a whole — particularly in the federal consumer protection agencies." According to *The New York Times*, the similarities between the First and Second Crashes were central to regulators' decision to ground the 737 MAX. According to *Bloomberg*, the Second Crash pilots requested to turn back just three minutes into the flight, much like the First Crash, in which the pilots requested to turn back. All of the governmental grounding orders of Boeing's MAX fleet, used by 13 airlines, has idled at least a quarter of the Company's global fleet.

70. On March 15, 2019, the Defendants caused Boeing to file its Proxy Statement with the SEC. There was not a single word about the Second Crash and its aftermath, or any of the material detrimental impact this has had on Boeing in the Proxy Statement, as required. Even as

adverse events continue to plague Boeing as described, Defendants have chosen not to even update the Proxy Statement with this more recent material information as required.

71.     On March 17, 2019, *The Seattle Times* and *Reuters* reported that Boeing knew about crucial flaws in the 737 MAX MCAS at least two weeks before the Second Crash.  On the same day it was reported that preliminary data recovered from the black boxes of the Second Crash revealed "similarities" to the First Crash, the Ethiopian Minister of Transport said.

72.     On March 18, 2019, the U.S. Justice Department announced it would conduct a probe into how the FAA regulated Boeing.  Defendant Muilenburg issued the following statement via the Boeing website: "lives depend on the work [the Company does]" and it must "embrace that responsibility with a deep sense of commitment every day."  "Our entire team is devoted to the quality and safety of the aircraft we design, produce and support.  I've dedicated my entire career to Boeing, working shoulder to shoulder with our amazing people and customers for more than three decades, and I personally share their deep sense of commitment."

73.     On March 19, 2019, Investor's Business Daily reported that federal prosecutors are looking into the development of the Boeing 737 Max as a potential criminal case.  Multiple reports also said that Boeing may have rushed to develop the 737 Max to better compete with European rival Airbus in the lucrative narrow body jet market.

74.     The U.S. House of Representatives and the Senate have also opened inquiries into Boeing.  In an "unusual move," House and Senate committees were preparing to separately question senior FAA leaders about the same issues facing Boeing.

75.     On March 19, 2019, *Reuters* reported the Lion Air pilots in the First Crash scoured the 737 MAX handbook in the minutes before the crash.

76.     On March 20, 2019, it was reported that the FBI was investigating how the 737 MAX was certified and European regulators were conducting their own investigation into the aircraft's control systems.

77.     On March 21, 2019, Reuters reported that in November 2018, American Airlines pilots confronted four Boeing executives in Fort Worth, Texas, demanding to know why the manufacturer had not told them about MCAS, made a cockpit warning light mandatory and whether a 56-minute iPad course on the MAX was sufficient.  "American Airlines pilots expect to test Boeing's 737 MAX software fix on simulators this weekend," the pilots' union told Reuters. *CNBC* reported that the First and Second Crash aircraft did not come equipped with safety features because Boeing charged extra money for them.

78.     On March 22, 2019, Peter DeFazio (D-Oregon), Chair of the House Committee on Transportation and Infrastructure, publicly encouraged Boeing/FAA whistleblowers to come forward.

79.     On March 25, 2019, *Bloomberg News* reported that Boeing would shortly provide a free 737 MAX software fix in as little as one hour.  Reportedly, as a result of the fix, data from two AOA sensors will be used in MCAS, altering the Company's prior reliance on only one AOA sensor, and a cockpit display would show when the two sensors registered conflicting data, as was the case (without the contrasting display) in the First Crash.  Furthermore, a warning light that previously cost money for airlines to add would now alert pilots if erroneous signals were sent from the AOA to MCAS.

80.     On March 26, 2019, *Fox News* reported, citing *The New York Times*, that flight simulations designed to recreate the First and Second Crash problems found that those pilots had less than 40 seconds to override MCAS's forced push downs of the plane nose, leaving little

23

margin for error. Furthermore, it was reported that the FAA expected Boeing's software update to issue later in the week and that Boeing said it would pay to train airline pilots on computers, not on a plane or in a flight simulator.

81.     On March 27, 2019, a Southwest Boeing 737 MAX was forced to make an emergency landing while en route to being grounded.

82.     On March 27, 2019, Crain's Chicago Business also reported that Boeing was close to a 737 MAX fix before the Ethiopian Airlines crash of March 10.  According to a Company executive, a lot of unknown, unknowns surrounded the MCAS potentially overwhelming pilots. At approximately the same time, Boeing launched a communications blitz to restore confidence in the MAX.  The Company began meeting with airlines and regulators worldwide, and it held detailed briefings for reporters and 200 pilots and industry officials on that day.

83.     Also, on March 27, 2019, *The Wall Street Journal* reported that Boeing's choices for engineering, producing and pushing the development of the 737 MAX were calculated to make "the redesign of its crucial 737 jetliner to go swiftly and smoothly, reduc[ing] regulatory scrutiny and accommodat[ing] its biggest customer by requiring as little new training for pilots as possible." More specifically, the article reported:

> Pilots flying the 737 MAX, which entered service in 2017, received no training on a new stall-prevention system and saw almost no mention of it in manuals, according to the pilots and industry officials. Most would get no visible cockpit warnings when a sensor used to trigger the system malfunctioned, and they had no access to simulators that could replicate the kinds of problems believed to have downed Lion Air Flight 610 in October.

> Following the second crash, in Ethiopia this month, a picture is emerging that suggests Boeing, as it hurried to get the plane on the market, put too much faith in its design and engineering, particularly of the automated stall-prevention system that was supposed to make the plane safer, according to interviews with safety experts, industry officials, former Boeing employees and former regulators.

Many questions remain about Boeing's handling of the redesign and what went wrong. The Justice Department and other federal agencies are investigating whether Boeing provided incomplete or misleading information to get the airliner certified as safe to fly.

* * *

There are indications that Boeing was aware that some 737 MAX models in the air lacked all the possible safety features available.

On November 27, about a month after the first crash, Boeing executive Mike Sinnett told American Airlines' pilot union that their pilots wouldn't experience the sort of problems that doomed the Lion Air flight, according to Dan Carey, union president. That's because American paid for an additional cockpit warning light that would have alerted them to the problem, while Lion Air and most other airlines didn't.

"This wouldn't have happened to you guys," Mr. Carey recalled Mr. Sinnett saying during the meeting. The cockpit indicators would have directed pilots to have the potential problem checked out on the ground. A Boeing spokesman said Mr. Sinnett didn't recall making that statement, and was unavailable for an interview.

It is Boeing's biggest crisis in years. The 737 has been the centerpiece of Boeing's business for decades, and the MAX was intended to carry that on. Now the entire 737 MAX fleet is grounded. Industry executives and former regulators say it could take years for the company to rebuild trust among airlines, pilots and foreign regulators. The fallout could affect the way the FAA monitors the development and approval of new aircraft essential for airlines to meet soaring global demand for air travel.

Boeing needed the MAX to offer a fuel-efficient option for customers to avoid losing market share to chief rival Airbus SE. Boeing didn't even wait for its board of directors to approve the design before offering it to American Airlines, which was on the cusp of buying planes from Airbus. Boeing's board didn't formally sign off on the MAX until a month later.

"Design, development and certification was consistent with our approach to previous new and derivative airplane designs," Boeing said.

* * *

Throughout the MAX's development, Boeing was intent on minimizing design changes that could require extra pilot training, said Rick Ludtke, a former Boeing engineer who worked on 737 MAX cockpit features but not the MCAS system. Extra training could have added costs for airlines introducing the MAX into service.

25

The company had promised Southwest Airlines, the plane's biggest customer, to keep pilot training to a minimum so the new jet could seamlessly slot into the carrier's fleet of older 737s, according to regulators and industry officials.

Mr. Ludtke recalled midlevel managers telling subordinates that Boeing had committed to pay the airline $1 million per plane if its design ended up requiring pilots to spend additional simulator time. "We had never, ever seen commitments like that before," he said.

Southwest, which has ordered 280 MAX aircraft, declined to comment on the issue, as did Boeing. A Southwest spokeswoman has said the airline developed its 737 MAX training based on Boeing's information and was a recipient of, not a driver of, the training mandates.

\* \* \*

Numerous pilots and safety experts interviewed by The Wall Street Journal said that in practice, amid the chaos of an aircraft lurching into a steep dive with emergency warnings blaring, it is unrealistic to expect pilots to recognize what is happening and respond almost instantaneously.

Bryan Lesko, an airline pilot who wrote an article last year for his union's magazine about the 737 MAX, repeatedly asked Boeing officials if there were any major new systems. The answer was no, according to a person who recently discussed the matter with him. The union declined to make Mr. Lesko available for comment.

Since the stall-prevention system emerged as a potential factor in the Lion Air crash, industry and government officials around the world have learned that the system can in certain situations push the plane's nose down repeatedly, undercutting the pilot's ability to regain control manually.

A software overhaul Boeing is set to distribute to airlines in the coming weeks will address that problem.

An earlier design decision by Boeing engineers was intended to make the stall-prevention system simple. It relied on data from a single sensor, rather than two, to measure the angle of the plane's nose, Boeing said.

Safety experts, pilots and some former Boeing engineers say it is rare for aircraft to rely on just one sensor for almost any system whose failure could cause a crash. A sensor malfunction was implicated in the 2009 crash of Air France Flight 447, when an iced-up airspeed sensor triggered a series of events that caused the plane to plunge into the Atlantic.

84.    On March 28, 2019, *Forbes* reported that the First and Second Crashes resulted from safety failures and the Company's rush to flight precipitated by Boeing's desperate need to launch the 737 MAX before the Company's biggest competitor – Airbus – could clinch a big sale of medium range jets to American Airlines. *Forbes* quoted reports in *The Wall Street Journal* that "Boeing rushed the 737 MAX to market -- it did not 'even wait for its board of directors to approve the design before offering it to American Airlines, which was on the cusp of buying [A320neo craft] from Airbus. Boeing's board didn't formally sign off on the MAX until a month later.'"  In pertinent part, *Forbes* reported as follows:

> How did this happen? The Journal argued that Boeing designed and built the 737 MAX in a way that would reduce regulatory scrutiny and require as little new training for pilots as possible to accommodate Boeing's biggest customer, Southwest Airlines.
>
> Most shocking of all, airlines that paid extra got better protection from a faulty MCAS than those who did not.
>
> Pilots flying the 737 MAX for Lion Air and most other airlines received no training on the MCAS system "and saw almost no mention of it in manuals, according to the pilots and industry officials. Most would get no visible cockpit warnings when a sensor used to trigger the system malfunctioned," according to the Journal.
>
> But American Airlines had paid extra for a cockpit warning light "that would have alerted them to the problem," according to the Journal.
>
> Dan Carey, the American Airlines pilots union president, said that a Boeing executive tried to reassure pilots after the Lion Air crash. According to the Journal, last Nov. 27, Boeing executive Mike Sinnett told a union meeting
>
> "This wouldn't have happened to you guys," Mr. Carey recalled Mr. Sinnett saying during the meeting. The cockpit indicators would have directed pilots to have the potential problem checked out on the ground. A Boeing spokesman said Mr. Sinnett didn't recall making that statement, and was unavailable for an interview.
>
> Rick Ludtke, a former Boeing engineer who worked on 737 MAX cockpit features but not the MCAS system, told the Journal that midlevel managers told their staff members that Boeing had committed to paying Southwest Airlines -- which has ordered 280 MAX aircraft -- $1 million per plane if the 737 MAX ended up requiring pilots to spend more time training on simulators.

27

Ludtke said, "We had never, ever seen commitments like that before." Southwest and Boeing declined to comment to the Journal on this.

Did Boeing mislead a pilot who asked about whether the 737 MAX had any major new systems? The Journal uses an anonymous source to suggest the answer could be yes, noting,

> Bryan Lesko, an airline pilot who wrote an article last year for his union's magazine about the 737 MAX before it entered service, repeatedly asked Boeing officials if there were any major new systems. The answer was no, according to a person who recently discussed the matter with him. The union declined to make Mr. Lesko available for comment.

* * *

The aftermath of 737 MAX crashes could cost at least $1 billion. JP Morgan analyst Seth Seifman told the Washington Post, "Boeing will probably owe something to the airlines. If the grounding lasts two to three months, it's possible Boeing could face roughly $1 billion to settle legal claims by the airlines."

Boeing CEO Dennis Muilenburg said he has been "humbled," according to a March 26 statement, and that "Boeing stands together with all our customers and partners to earn and strengthen the flying public's trust and confidence in us every day."

Richard Aboulafia, Teal Group Vice President, thinks Boeing has a long way to go to restore its reputation. As he told me in a March 28 interview,

> It has taken a serious blow. Fortunately, they have deep pockets, and this industry has very high entry barriers. The big question is really about the FAA and Boeing, and whether the system of international aircraft certification reciprocity can be restored and maintained. [To restore its reputation, Boeing will need to] work in a very transparent way with regulators at the FAA, EASA, Transport Canada, and the CAAC. Their recent moves towards humility are extremely welcome and necessary.

85.    On March 31, 2019, *Fox News*, in an article entitled *Final moments of Ethiopian Airlines Boeing 737 Max revealed: Pilot recorded saying 'pitch up, pitch up,'* reported the final moments of pilot frenzy before the Second Crash:

> One of Ethiopian Airlines Flight ET302's pilots told the other "pitch up, pitch-up" moments before the doomed Boeing 737 Max jetliner crashed three weeks ago, a new report revealed.

28

That instruction and other information about the plane's final moments paint a picture of a flight crew that was quickly overwhelmed, *The Wall Street Journal* reported Friday.

The Ethiopian Airlines jet took off from Addis Ababa on March 10 and ran into trouble almost immediately, the Journal reported.

First Officer Ahmed Nur Mohammed contacted the control tower and in a crackling transmission reported a "flight control problem," according to the newspaper, which cited people close to the ongoing investigation.

The tower asked for details as Captain Yared Getachew tried to climb and correct the glide path, the paper reported. Two minutes into the flight oscillation became a wild bounce, then a dive. The flight lasted fewer than six minutes.

The pilot who urged the other to pitch up was not identified.

86.     On April 1, 2019, *The Seattle Times* reported that "a federal agent served a grand jury subpoena Monday seeking information from an aviation flight-controls expert and consultant as part of a sweeping and aggressive criminal investigation into the [737 MAX]'s certification." According to the article, the expert subpoenaed was Peter Lemme, a Kirkland-based former Boeing flight-controls engineer, now an avionics and satellite-communications consultant, who said that the subpoena was served by a special agent from the Seattle field office of the Department of Transportation's Inspector General and that "he will fully comply."  The article reported further:

That the investigation is seeking information from someone with peripheral knowledge of the MAX's certification, someone outside Boeing and the Federal Aviation Administration (FAA), is highly unusual and shows the Department of Justice is casting a very wide net.

The subpoena came on the same day that a congressional committee requested records from Boeing and the FAA related to the MAX certification.

* * *

[T]he subpoena to Lemme is the first documented confirmation of the grand jury investigation, which has been previously disclosed only in news accounts citing unnamed sources, and provides the clearest picture yet of the extent of the criminal probe.

29

A Justice Department official declined to comment Monday evening and referred questions to the department's media representatives, who also declined comment.

The subpoena directs Lemme to provide to the grand jury by April 12 "any and all documents, records, emails, correspondence, audio or video recordings, text messages, voice messages, chats and/or other communications including drafts related to the Boeing 737 MAX."

This request, the subpoena states, is "to be construed broadly" and to include all photos, voicemails and cellphone-app communications.

Lemme is also directed to appear in person before the grand jury in Washington, D.C., on April 12, or, in lieu of that, to provide all this documentation promptly to federal prosecutors in the Fraud Section of the U.S. Justice Department's Criminal Division. The lead prosecutors are Cory Jacobs and Carol Sipperly, according to the subpoena. The FBI has also joined the investigation.

87.     On April 2, 2019, *ARS Technica* reported that Boeing's promised fix to the 737 MAX flight system software was pushed back several weeks after an internal review by engineers not connected to the aircraft raised additional safety questions. The peer-review has not been revealed, according to this article, "but the FAA confirmed on April 1 that the software needed additional work."

88.     On April 3, 2019, *The Wall Street Journal* reported that, according to people briefed on the probe's preliminary findings, the pilots at the controls of the plane involved in the Second Crash "initially followed emergency procedures laid out by the plane maker but still failed to recover control of the jet."  According to the article, "[t]he sequence of events, still subject to further evaluation by investigators, calls into question assertions by Boeing and the U.S. Federal Aviation Administration over the past five months that by simply following established procedures to turn off [] MCAS, pilots could overcome a misfire of the system and avoid ending in a crash." More specifically, the article reports the final moments of the plane's path as follows:

The pilots on Ethiopian Airlines Flight 302 initially reacted to the emergency by shutting off power to electric motors driven by the automated system, these people

30

said, but then appear to have re-engaged the system to cope with a persistent steep nose-down angle. It wasn't immediately clear why the pilots turned the automated system back on instead of continuing to follow Boeing's standard emergency checklist, but government and industry officials said the likely reason would have been because manual controls to raise the nose didn't achieve the desired results.

After first cranking a manual wheel in the cockpit that controls the same movable surfaces on the plane's tail that MCAS had affected, the pilots turned electric power back on, one of these people said. They began to use electric switches to try to raise the plane's nose, according to these people. But the electric power also reactivated MCAS, allowing it to continue its strong downward commands, the people said.

* * *

The latest details are based on data downloaded from the plane's black-box recorders, these people said. They come as Ethiopian investigators prepare to release their report about their preliminary conclusions from the accident, anticipated in the coming days.

89.    On April 3, 2019, in a Bloomberg Opinion article entitled *Boeing's 737 Max Defense Just Got More Difficult*, it was reported that the foregoing reports in *The Wall Street Journal* were not reassuring for Boeing, its investors and customers.  If the events reported are correct, according to this article, then:

- Boeing and the U.S. regulators may have provided insufficient advice to pilots in their initial bulletin and were too hasty in pronouncing the aircraft safe.

- It would also increase the likelihood the manufacturer could be sued for damages. Before the Journal report, Bloomberg Intelligence put those costs at an estimated $1 billion.

- The report could also sow doubt about whether the software and sensor fixes that Boeing is proposing are sufficient and thus prolong the period that the 737 Max will remain grounded.

90.    On April 4, 2019, *CNN Business* reported that so far one airline – Indonesia's Garuda – has publicly canceled a $4.9 billion order for fifty 737 MAX airplanes.  Boeing will also have to pay a significant amount of money to reimburse airlines for the grounded planes.

31

According to Cowen aerospace analyst Cai von Rumohr, the cost for the grounded planes is estimated to already be $2 billion and will increase every day that the planes are grounded.

91.    On April 4, 2019, CNN.com published an article entitled *Boeing CEO 'Sorry' For Lives Lost in 737 MAX Accidents*, following the release of a preliminary report conducted by Ethiopia's Ministry of Transport.  According to the article, "its finding make it likely that the MCAS system pushed the plane into a dive fueled by erroneous angle of attack sensor readings."

92.    Boeing issued a statement on April 4, 2019, in which the Company conceded the similarities between the two crashes, "[t]he preliminary report contains flight data recorder information indicating the airplane had an erroneous angle of attack sensor input that activated the MCAS function during the flight, as it had during the Lion Air 610 flight."  The statement continued, "[t]o ensure unintended MCAS activation will not occur again, Boeing has developed and is planning to release a software update to MCAS and an associated comprehensive pilot training and supplementary education program for the 737 Max."

93.    On April 5, 2019, Boeing announced an almost 20% cut per month in production of the 737 MAX instead of the 10% increase in production as originally planned and finally took responsibility for the two crashes with defendant Muilenburg stating that, "We now know that the recent Lion Air Flight 610 and Ethiopian Airlines Flight 302 accidents were caused by a chain of events, with a common chain link being erroneous activation of the aircraft's MCAS function." Boeing also announced that it was shifting resources away from production to develop the new software, etc. to address the MCAS issue and has formed a Special Committee of its Board to review company-wide policies and processes for the design and development of Boeing aircraft.

94.     On April 5, 2019, *The Wall Street Journal* reported that analysts' expectations are that a return to flight and resumption of deliveries for the 737 MAX are expected to be months rather than just weeks away.

95.     The foregoing information described in ¶¶ 36-94 above, are omitted from the Proxy Statement connected with the Boeing annual stockholder meeting scheduled for April 29, 2019.

**The False and Misleading March 15, 2019 Proxy Statement**

96.     On March 15, 2019, Boeing announced that it scheduled its annual stockholder meeting for Monday, April 29, 2019.

97.     On March 15, 2019, approximately six weeks before the stockholder meeting, Boeing filed the Proxy Statement with the SEC on Schedule 14A, and thereafter disseminated it to its shareholders, seeking amongst other things: (i) approval of the slate of 13 nominated to be directors of the Company; and (ii) approval, on an advisory basis, of named executive officer compensation.  The Proxy Statement states that Shareholders of record at the close of business on February 28, 2019 are entitled to vote at the annual meeting.

98.     At page 1, under the heading Performance Highlights, the Proxy Statement contains several diagrams reflecting the Company's purported achievements of 2018, including:

- Record revenue of $101 Billion;
- 11.5% Total Shareholder Return;
- 141.8% Total Shareholder Return since 2016;
- $21.7 Billion spent on share repurchases since 2016;
- Dividends to shareholders of $10.1 Billion since 2016; and
- Improved operating cash flow of 64% since 2016.

99.     At page 17, the Proxy Statement states that "per passenger mile, 737 MAX is as efficient as a hybrid-electric car."

100.    At page 23, the Proxy Statement states that "2018 was a very strong year for Boeing, with record revenues, operating earnings, operating margins, earnings per share, cash flow, and commercial aircraft deliveries.  Our shareholders shared in this success, as evidenced by our Dow Jones Industrial Average-leading total shareholder returns during 2016-2018 (141.8%) and 2014-2018 (168.8%)."

101.    Regarding the solicitation of shareholder votes to approve, on an advisory basis, the compensation of the named executive officers, the Proxy Statement states: "Our executive compensation program is designed to reward strong performance, attract and retain superior leaders, and align our executives' interests with the long-term interests of our shareholders."

102.    Although shareholder votes for compensation are on an advisory basis, the Proxy Statement touts the approval percentage and explicitly states that the voting results are incorporated in compensation decisions:

> In 2018, our executive compensation program received 93% approval from our shareholders.  The favorable shareholder vote and positive feedback from investors were two factors that contributed to the Compensation Committee's decision to make no substantial changes to our compensation practices and policies in 2018. The Compensation Committee will continue to consider say-on-pay vote results and feedback from shareholders when reviewing our executive compensation programs and practices.

103.    In that connection, the Proxy Statement represents that Boeing's compensation discussion and analysis includes consideration of the following:

***Pay for Performance***

• annual and long-term incentive metrics that align with our business strategy, focusing our executives on increasing revenues, reducing costs, effectively managing net assets to optimize cash flow, and generating sustainable increases in shareholder value;

• more challenging annual and long-term performance targets, including a 2016-2018 long-term incentive performance target that exceeded the 2015-2017 target by 12%, and 2018 annual performance targets that, on average, exceeded 2017 targets by 36%;

• Approximately 90% of our CEO's 2018 target compensation was variable and at risk;

• capped payouts and other protections to avoid excessive risk;

• No incentive payouts for performance below threshold;

***Alignment with Shareholder Interests***

• 25% of our named executive officers' target long-term incentive compensation is tied to Boeing's total shareholder return relative to a pre-established group of peer companies;

* * *

***Responsible Pay Practices***

• benchmarking design practices and pay levels against industry peers and other similarly-sized companies, with pay opportunities generally targeted at or near the median;

• Robust clawback policy applicable to all incentive pay.

104.    In describing the performance measures driving the 2018 compensation, the Proxy Statement represents, among other things, that: (i) revenue of $100B exceeded target revenue of $97B; (ii) free cash flow of $13.6B exceeded target cash flow of $12.8B; and (iii) core eps of $15.51 exceeded target eps of $14.00.  The Proxy Statement also includes the following additional "drivers of performance" associated with the performance metrics purporting to support the compensation for which shareholder approval is sought:

| Drivers of One-Year Performance | Additional Drivers of Three-Year Performance |
|---|---|
| • Operating cost management | • Efficient use of long-term assets |
| • Disciplined asset, inventory and cash management | • Technology innovation |
| • Business execution | • Sustained productivity |
| • First-time quality and on-time delivery | • Long-term risk reduction |
| • Achievement of annual productivity targets | • New orders with favorable terms |
| • Strong services order capture | • Business model enhancements |

105.   The Proxy Statement was filed with the SEC on March 15, 2018, after both the First Crash and Second Crash had already occurred.

106.   The Proxy Statement does not discuss either the First Crash or the Second Crash. There is also no mention of the substantial cost and loss of revenue that the Company will experience as a result of these crashes.  The only mention of either crash is in the "Shareholder Proposals" section (page 58) which states, "[i]mportant day-to-day issues facing Boeing are the $2 billion in losses on the KC-46 Air Force tanker aircraft before the first aircraft is delivered and the Boeing 737 MAX Lion Air crash potentially due in part to faulty anti-stall protections."  The Board unanimously recommended a vote against this shareholder proposal – to appoint an independent board chairman – and did not comment on the First Crash.

107.   Contrary to the representations made by Boeing and the other Defendants to Boeing shareholders in the Proxy Statement and in direct contravention of the disclosure obligations mandated by the Exchange Act, Defendants have failed to disclose the following negative and adverse information in connection with their proxy solicitations: namely, the recent crippling events and circumstances that have shaken the Company to its core, subjected the Company to virtually unlimited civil and criminal prosecution and investigation, grounded its most innovative and profitable fleet of 737 MAX jets, and, among other things, left the Company scrambling to fix its most advanced automated flight systems and controls that both paralyzed its fleet and unveiled an air of secrecy and disinformation surrounding the introduction of this fleet without the necessary warnings to and training of pilots before introduction of the new automated systems incorporated into the design and engineering of this fleet and the method for stabilizing a plane experiencing a malfunction of these automated systems, including but not limited to:

- The fact that two practically new Boeing 737 MAX aircraft came crashing down to earth with a full payload of passengers and crew within only a few short minutes after takeoff, leaving no survivors;

- In both cases, the planes presented the pilots with hazardous readings and maneuvers almost immediately after take-off.

- In both cases, the automated flight systems essentially took control of the aircraft away from the pilots and would not allow the pilots to override these systems and wrest back control of the aircraft.

- In both cases, defective and unreliable "angle of attack" sensors played a significant role;

- In both cases, MCAS was defective and unreliable and played a significant role;

- MCAS was defective and unreliable because, among other things, it was activated by data from only one sensor, even if another sensor indicated the plane was not close to stalling;

- MCAS was defective and unreliable because, among other things, if it was engaged at takeoff, pilots had less than 40 seconds to override MCAS's forced push downs of the plane nose, leaving too little a margin for error;

- MCAS's role in flight was never fully disclosed to pilots and never properly developed to begin with;

- MCAS could push 737 MAX aircraft down even when its nose is not up and despite pilot efforts to pull the plane up;

- According to the latest reports, the defective sensors and the MCAS system itself combined to fool the automated flight systems in the 737 MAX accidents to "think" that the planes' noses were too high, resulting in the system pushing down the noses, causing a frantic battle between man and machine for most of the time these planes were in the air, superseding even the manual commands of pilots attempting to correct the mis-positioning of the aircraft;

- Boeing knew about the defects and unreliability of its angle of attack sensors and MCAS, but failed to notify regulators and pilots thereof;

- Boeing put money ahead of safety by charging airlines $80,000 to install a warning light in the cockpit to alert pilots if erroneous signals were sent from the angle of attack sensors to MCAS;

37

- Boeing recklessly rushed introduction of the 737 MAX to avoid losing market share to chief rival Airbus SE;

- The Board was derelict in failing to properly vet and approve the 737 MAX design before it was offered for sale;

- Boeing artificially minimized 737 MAX design changes so that extra pilot training would not be required by the FAA and retraining costs for airlines would be obviated;

- Boeing's reputation for safety and its tradition of prioritizing pilot authority over automation has been seriously tarnished by the foregoing;

- Regulators globally have grounded all 737 MAX flights;

- Boeing's stock price has suffered an enduring slide, losing about $30 billion in market value;

- Federal prosecutors have opened an investigation into the development of the Boeing 737 Max as a potential criminal case;

- Congress has opened inquiries into the development of the Boeing 737 Max and its approval by the FAA, publicly encouraging whistleblowers to come forward;

- European regulators have opened inquiries into the safety of the 737 Max;

- Boeing has formed a Special Committee of its Board to review company-wide policies and processes for the design and development of Boeing aircraft;

- Boeing has cut production of its 737 MAX by over 20% instead of increasing production by 10%, as originally planned;

- Boeing is shifting resources away from production to develop the new software, etc. to address the MCAS issue;

- Garuda Indonesia Airline publicly canceled an order for the 737 MAX in the amount of $4.9 billion representing over 50 planes;

- Boeing faces a huge bill to reimburse airlines for the grounded planes, which has been estimated to already be approximately $2 billion, and that increases daily;

- Analysts have opined that a return to flight and resumption of deliveries for the 737 MAX is expected to be months rather than weeks away; and

- Boeing is a named defendant in several wrongful death suits arising from the 737 Max accidents.

108.   Consequently, the representations made by Boeing directly in or incorporated by reference in the Proxy Statement and detailed above in ¶¶ 98-106 contained materially false and misleading statements and omitted to state matters that were required to in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to a solicitation for the same meeting or subject matter which as become false or misleading.

109.   Plaintiff and the Class have no adequate remedy at law.

## COUNT I

## VIOLATION OF SECTION 14 OF THE EXCHANGE ACT

110.   Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

111.   The Proxy Statement constitutes communications to Plaintiff and members of the Class under circumstances reasonably calculated to result in the procurement of proxies within the meaning of Exchange Act Rule 14a-1(f), and are therefore solicitations within the meaning of Exchange Act Rule 14a-1(l)(iii).

112.   Exchange Act Rule 14a-9 states, in relevant part, "No nominee…shall cause to be included in a registrant's proxy materials…any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to a solicitation for the same meeting or subject matter which as become false or misleading."

113.    Boeing has engaged in a course of conduct pursuant to which it made solicitations by means of the Proxy Statement containing statements that, at the time and in the circumstances under which they were made, omitted to state material facts necessary in order to make the statements therein not false or misleading.

114.    By reason of the foregoing, Boeing has violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

115.    Boeing's conduct has injured Plaintiff and the other members of the Class, for which they have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment and relief against Boeing as follows:

(1)    Declaring this action to be a proper class action and certifying Plaintiff as class representative;

(2)    Declaring that Boeing has violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder by the SEC;

(3)    Entering an order enjoining Boeing from holding its shareholder vote on April 29, 2019 or until such time as the Proxy Statement has been adequately revised;

(4)    Awarding Plaintiff damages, if any, and the costs and disbursements of this action and reasonable attorneys' fees and expert fees; and

(5)    Awarding such other and further relief as the Court deems just and proper.

## <u>JURY DEMAND</u>

Plaintiff demands a trial by jury.

Dated:  April 8, 2019

**WEISSLAW LLP**

/s/ Mark D. Smilow
Mark D. Smilow
Joseph H. Weiss
David C. Katz
Joshua M. Rubin
1500 Broadway, 16th Floor
New York, New York 10036
(212) 682-3025
(212) 682-3010 (Fax)

**FARUQI & FARUQI, LLP**
Stuart J. Guber
Alex B. Heller
1617 John F. Kennedy Blvd., Suite 1550
Philadelphia, Pennsylvania 19103
(215) 277-5770
(215) 277-5771 (Fax)

*Attorneys for Plaintiff*